Good morning. You may proceed. May it please the Court, I'm James Pray of the Brown Winnick Law Firm in Des Moines, Iowa. This morning I'm making this argument on behalf of my client's appellants Agri Star Meat & Poultry and SHF Industries. This case is about the interpretation and application of this particular document I have in my hand. It was added to the addendum on page 45. It also appears in the appendix. This is a combined lease and easement agreement that was signed in 2005 between two related entities, Nevel Properties Corporation, the Appellee in this case, and AgriProcessors, Inc., the debtor in a different bankruptcy case. At the top of this document it reads, Deep Water Well Lease-Waterline and Access Easements. The purpose of this combined agreement was to allow AgriProcessors to build and operate a deep water well to supply essential water to the water treatment facility and the meat processing plant in Postville, Iowa. The well throughout the case is typically referred to as well number three. The central issue I want to discuss this morning is whether all of the property rights to well number three granted to AgriProcessors in this combined agreement were stripped away during the AgriProcessor bankruptcy, not the Nevel bankruptcy that this case is captioned as, through the operation of bankruptcy code section 365D4. Because this document combines easement rights and lease rights to well number three, I'm asking that this court rule that both the bankruptcy court and the district court were wrong when they held that 365 stripped this agreement from the AgriProcessors trustee before the trustee could sell those rights to my client, Agristar. Briefly... Now, Agristar, or S-H-A-F, were they a party to the agreement? Excuse me? Was your client a party to this lease agreement? They were not a party. They obtained this through the sale. Where does it derive its rights from? What's that? Where does your client derive its rights from? They derived their rights through the Dragnet Clause, and if I can skip down here, on July 20th, 2009, the court approved the sale of assets of AgriProcessors to S-H-F, the holding company. That included executory contracts and also included, I believe the wording is... You acquired it from the bankruptcy court through the bankruptcy sale? Yes. Well, the agreement, the order says, all other rights and assets related to or used in the connection with the conduct of the business that are subject to the loan, and collateral assignments subject to the first bank assignment and the MLIC assignment. And then there was a, as I said, there was a definition of assets, which specifically included easements. Also included tenements, which would include the lease. Well, why can't we infer from the correspondence, the email correspondence, that there was a conscious decision not to sell this? Because there's email correspondence that specifically asks the question, what property is there that's outside the plant itself, that's not owned by AgriProcessors? And there were two items, essentially, the wastewater lagoon and the well. And the agreement specifically talks about acquiring the wastewater lagoon. But even after being advised that there's this well, nothing was done about it. There was no attempt to assume the lease. It wasn't described in the agreement. Why can't we infer a conscious decision? I think one, several facts. First off, the parties to this, AgriProcessors and Neville, had never exchanged any money for it. The courts already indicated, or I should say the bankruptcy court indicated, that these were inextricably tied companies that were not following all of the formalities of the relationship.  I mean, you know, you have two companies, but all of a sudden, when one's in bankruptcy and one isn't, now you've got to start to follow formalities. And if AgriProcessors hadn't paid the rent for years, they would have had to bring that current. And maybe that's why they didn't want to do it. Well, you, I mean, I guess you could ask whether there's an inference. I would say that what we need to go back and look at the species of the document, whether 365-D4 even captures it. If it's a separate issue, I believe not before this court, whether the AgriProcessors bankruptcy adequately set forth in the drag net clause and all the other provisions. That is something that needs to be collaterally attacked some other way. The key issue in this case is whether this document, which has both attributes of an easement and a lease, was even caught in Section 365-D4. It's our position that it was not. Well, counsel, on its face it is, right? It says, if you look at the 365-D4A, it says a lease of non-residential real property. This is a lease of non-residential real property. Right? Let me throw this out as an example. Sure. I know we're not supposed to ask how is bologna made, but AgriProcessors makes things like bologna, salami, meats. Kosher. It's a kosher facility. Right, right. Exactly. So if I walked in to the facility with a lamb on one leash and a pig on the other, I'm not coming into that facility. I would probably be met with violence if I tried to take that pig in there. This document has two species. It has an easement and a lease. If you try to take both of these in to what I would call the 365-D4 grinder, it is stopped at the door. It doesn't go in. Unless you believe they're inseparable. What's that? Unless you believe instead of taking in two animals, you're taking in one inseparable animal. If I brought in a hybrid of a lamb and a pig, I can guarantee that the kosher rabbis at Hagerstark would not allow that. Of course, I could pick some animals that would come in. So what we're really talking about is you say is it mostly a lease or not mostly a lease? I don't think that's the proper way to look at it. Why not? It's one document. It's both. Now, counsel, they begin and end at the same time, right? The easement does not last forever. It terminates the end of the lease. And they're inseparable in operation, too. Functionally, they're inseparable. Can one function without the other? I think that if you look at the last page, which is the map, you'll note that the easement covers the well area. The extra area around this, I'm not even sure why they have a lease for that land. We have enough to operate this with just the easement. I'd also ask the court to look at the two primary purposes that are listed in paragraph 2 of the agreement. It says the primary purposes of this agreement are, one, a lease, and, two, the easements. I believe that they are both listed as two separate interests. Well, counsel, the only problem with that is 2 says to grant easements necessary for access to the premises to do number 1. I think 1 and 2 tie them together again. I think they both support each other. The one thing about this, this is not your classic lease that, you know, the courts have talked about in the bona fide lease cases, which I don't believe this circuit's adopted yet. But if you look at the functional attributes of the particular easement here, this is more like a conveyance of water from point A to point B. The focus by the district court, the bank district court, is all about you have a lease for an area that includes the area around the easements that that is supposed to provide a well. But I think you have to look at the whole thing. It's not just a well. A well by itself is useless. Water would spray in the air and go nowhere. We have to convey that water to the plant for the function of the plant, and the functions associated with the water treatment facility, which requires a lot of clean water. Oil and gas area, this is very typical. I don't know if water is that much different. You lease, and then you have an easement to get access to it. But it's always referred to as a lease with an easement. A lot of times with an underground interest, you can have it as an easement, you can have it as a lease. In this case, they have an easement for the actual access to the well. An easement wouldn't allow you to remove something from the property. An easement would not allow you to take the water out. It wouldn't allow you to take the oil or gas out. It just allows you to get there. It allows you to look at it. You walk up, and you can look at the well, and then turn around and leave. Drive up to it. The purpose of the easement is to allow the pipeline to convey the water. But it doesn't allow you to take it out. I would say that there's more things to getting the water to the plant than just taking it out of the ground. You have to take it out of the ground, and you have to convey it. You don't have anything to transport. Excuse me? If you don't have the lease to get the water out of the ground, you do not have anything to transport in the pipeline for the easement. But they're combined. You have to have both of them at the same time. You can't just say, well, under the 365-D4, we'll take the lease part, we'll chop that off, and let the poor guy go without a way to convey it or to get it there. Well, are you making any argument that there has to be a relative value? Use Chief Judge Riley's example. What if you had an oil lease? The oil is worth millions of dollars, but you still need to get a pipeline. You're saying that that's not a true lease because there's a pipeline there that may be worth a few thousand, but it's not a true lease that's subject to rejection or acceptance. Well, I guess, and I can't speak for every single type of underground mineral interest that could be conveyed or pumped, but in that example, if you have a commodity such as oil and you don't have a particular thing it has to go to, it just has to go into the system somewhere so someone can price it and buy it and sell it, that's one thing. This particular document was drafted for the specific purpose of providing water to the agri-processor's plant. I think to focus on just the well taking it up out of the ground to the exclusion of the function that it provides to the whole thing is incorrect. I guess to answer your question specifically, I would ask the court to look at the materiality of the easement part of the agreement. Is it material to the overall agreement? Say they're separable and you get to own the easement, but you don't get the water. Well, the water well is a lease and you've lost, you know, under 365, you can't own it because it's been rejected from lack of acquisition by the trustee. So you have your easement, but you don't have your well. I have my easement, and I guess I'm asking the court to adopt a standard that's material. You'd have to say the easement is all controlling. I'm not necessarily saying that. And it sucks the lease along with it. It's kind of like my example of the pig trying to come in. It doesn't matter how big the pig is. The pig's not coming in to the door. This, you can flip it around. Can this lease operate without the easement? No. The easement is a material part of the overall agreement. Can the easement operate without the lease? Maybe not, but I think they're both material to each other. Well, do you think you owe any rent? Maybe it's not material to the issue, but as I understand it, are you arguing that you don't owe anything? That you don't have to pay anything for this? All I can say is what the record is is no rent's been paid as through the period of time that the record was made. And that goes from 2005 all the way up, which gets to my what is this creature really, you know, as the courts look at it, not just the four corners of the document, but how have these two entities treated it? I believe they treated it as something other than a pure, simple shopping mall lease. Okay. Well, I'll save my one minute. Okay. Thank you. Okay, Mr. Gaynor. Good morning. Thank you, Your Honors. May it please the Court, Robert Gaynor on behalf of Appali Neville Properties Corporation, and I'm asking this Court to affirm the District Court for the Northern District of Iowa, which upheld the bankruptcy court order confirming the bankruptcy plan. And what I would like to address on file before you is the motion to dismiss that we have filed deeming this appeal as equitably moot. There are five factors that this Court is to look at when examining whether an appeal on a bankruptcy reorganization plan is equitably moot. I think first and foremost is was a stay filed. There was no stay filed. There was no bond posted. And this is important on a large scale because it's a policy consideration. When you look at the reliant and expectation interests of parties to these plans, particularly investors, which is present here, we have investors that relied on the confirmed plan to contribute additional funds to allow for effective payments. We take away that reliance interest. We have a significant problem going down the line. Additional factors that are to be looked at are the parties that are not before this Court's rights that would be affected. We have these investors that contributed over $400,000 so that effective date payments can be made. We have creditors who have received payments, and if this Court were to reverse any portion of the bankruptcy court order confirming the plan, could subject those creditors to disgorgement or some kind of order requiring disgorgement on payments that they have received on a plan that they may or may not have voted for. Additional factors to be looked at include would the relief requested affect the success of the confirmed plan? Well, of course it would. You take away $400,000 of payments needed to be made on the effective date, you're going to throw significant flags for parties moving forward as to whether this plan continues to be confirmable. Well, what's the, under the confirmed plan, how's the well being used? The well is being marketed right now to provide a revenue stream. So as of this date, it has not added any value to the plan? I would disagree with your statement there, Judge, in the sense that it's being marketed, there's negotiations that are ongoing. Has it added value to the plan? I mean, it's a yes and a no question. Yes, there's a lot of potential value to be there. Has there been any realized value at this point? No, there has not. But it would have, stepping back from the value Is there a market for this well other than agro? I mean, is this really all about how much you can get for the well with agro processes? Is there a market for the well other than agro processes? There is a separate party that has approached us about purchasing the well. So it is not a two-party problem here. There's other potential purchasers of the well. Do you actually use the water, or they just take it over and they negotiate with agro processors? I think they would actually use the water. I don't know that, though. Again, there are two more elements. One is the public policy affording finality to bankruptcy court orders on plans. And the Eighth Circuit has been very explicit in saying that there is a strong public policy behind affording that finality. And the last element is, has the plan been substantially consummated? And we would argue that the plan has been substantially consummated. There still remains one thing to be done relative to the transfer of the lagoon leases to this SHF party. That is the sole remaining occurrence that needs to happen for substantial consummation. As it relates, and for these reasons, I believe that this appeal is equitably moved. And I really drive home back that first one. If there is no stay that's obtained at the trial court level, no bond posted, there has to be some mechanism by which investors and other parties can rely upon the finality of a bankruptcy court order. I guess what I'm getting at is you keep talking about there has to be reliance. What was the value that was placed on the well that these investors were relying upon that's now equitably estopped? It would be upwards of a million dollars. And that was in the plan. So if I were an investor saying I might put some money into this project, I looked at the disclosure statement or some document that said I'm relying upon a value of a million dollars because they don't have a lease anymore. If you looked at the plan, the language that you would see available is that the fair market value of the water well was not being realized. And if that specific number was not written, a million dollars was not referenced in the plan of reorganization. But if one was to employ any forms of the discounted capital analysis that these investors perform, simply using a discounted cash flow on the lease payments that were supposed to have been made on this well would likely put that over a million dollars. But addressing the contentions of the appellant's argument, you have before you, Judge Collins, extraordinarily well-reasoned decision as it relates to confirming the plan. And he goes through great lengths to talk about the close relationship between Neville Properties Corporation and the predecessor in interest to SHF. Judge McManus recognized this in the affirmance he gave at the district court level. You know, this court has identified that this deep water well lease and any easement that's being argued are inextricably linked. And any easement created is a temporary easement based on the very nature of that document. It's 50 years, right? That's correct, Your Honor. Yeah, well, that seems to denigrate temporary. What about the fact that there's a separate lump sum payment for the easement and regular rental payments for everything else? I think that just had to do with creating the opportunity for the easement, Your Honor. But they're paid for differently in different ways, right? They are. That's correct. And how much, I just looked at it, how much was paid for the easement alone? I don't have the lease in front of me. Well, and I do. $2 per lineal foot. Do you have any idea what that is? I do not. I don't either. Do you know how it compares to the lease payments, whether one's a lot bigger than the other or a lot smaller? I do not, Your Honor. The rent is $10,000 per year. The regular lease payment, I'm pretty sure of that. That is, the lease payment was $10,000 per year, and that was never made. Was the $2 purchase price for the easement per lineal foot ever made? That would be more than 5,000 lineal feet. Yeah. Surely, that's a short distance. I do not know that. Look at the maps in the back. Well, thank you. We'll try to figure it out. Going back to the fact that this bankruptcy was I might add, just while we're on it, to save your thought, several times in the description of the easement, it turns and goes 500 feet here, and it turns and goes 25,000 square feet. I don't know whether that's the whole thing, or I can't tell. I can't tell whether that's a length or whether that's kind of an area. So maybe a lot more was paid for the easement than the lease. That was not brought up at the trial court level. But in any regard, you say no money was paid for either of these. These are all fairytale numbers. There was no money exchanged relating to the lease. Okay, or the easements. I do not believe. I do not know. What does the record reflect on the easements? That's a basic fact. Were they paid for or not? I don't think any. What the record reflects is that nothing was exchanged on account of that lease. I thought nothing was paid for either one of them, but I don't know that. I just guessed that. Have you physically seen this area? We're talking about linear feet. We're talking about a mile approximately. Is it a mile long? Do you know it's a mile long? I've seen aerial pictures, Your Honor. Pardon me? I've seen aerial pictures, so I don't have a restaurant. We have that map. I don't know if the map tells us that. More curiosity, but go ahead. Addressing the contentions about these two different bankruptcies, the Bankruptcy Code provides a specific mechanism for a trustee to reject or assume a particular lease, and the bankruptcy trustee in the agri-processors bankruptcy, a separate bankruptcy filed in originally the Eastern District of New York and transferred to the Northern District of Iowa, did not assume any lease relating to this particular lease at issue here. It was not assumed. It was deemed rejected by the expiration of the deadline in the operation of Bankruptcy Code Section 365. As a result of this, many of the arguments made by appellant, and as addressed at the bankruptcy court level, are conclusively found that they just, the well lease was not an asset intended to be purchased. We have in the brief reply brief provided by the appellee, we show the correspondence, as Judge Malloy noted, relative to this contention. I think by 365's very operation, the rejection of the lease caused no right to an ear for SHF, and as a result, the lease was, there was, it was an unexpired lease, and with the effect of 365D, it's kind of the end of the story. You agree, though, it has to be a lease to get into D4A? A lease or an executory contract, Your Honor. I'm looking back, I'm looking for Judge Collins' order, and I have it right here in front of me. Did he make a specific finding as to whether, assuming that it was transferable, whether this dragnet clause that's been referred to transferred it? He did, and he said it did not. It did not. So even if it was assumed, it was not transferred. I'm sorry, restate that, Judge. Assuming it was affirmed and it was transferable, did he make a finding of whether it was, in fact, transferred? Assuming what was affirmed? Pardon me? I'm sorry, assuming what was affirmed? Assuming the lease was transferable. Your argument is the lease is not transferable because it was never assumed, right? Let's assume it was transferable. Okay. But it's not listed as a specific transferred item, right? Okay. So the argument that Mr. Prey is making is that this, what I think he referred to as the dragnet clause about all other assets, then covers it. And I would say that. Well, and let me finish. Did Judge Collins make a specific finding on that point, whether the dragnet clause covers this lease if it was assumed? In other words, an alternative finding. I do not believe so, Your Honor. Okay. For these reasons. It runs my mind he did say that it was not a listed asset. But I guess if he did say that, that would be, at least by inference, the so-called dragnet clause he was finding did not pull it in. That was his conclusion, Your Honor. Well, okay. Anything else? Nothing further, Your Honor. We would ask simply that the district court and the bankruptcy court be affirmed. Thank you, Mr. Gaynor. Thank you all. Mr. Pray, I think you have a couple minutes or one minute. We'll give you a whole minute. Thank you, Your Honors. There was some talk here about a million-dollar value, which I don't know where that came from. But going back to Judge Malloy's question about the e-mail, if you look at the fact that we had a $10,000-a-year lease with, I think it was a CPI adjustment, you have a single-time payment of $2 per linear foot. How much would that be? We're dying to know. How much is that total up to? How many feet are there? Well, I was counting it using my little lines on here on the map. I got to, before I had to come up here, I got to 2,200 feet. It might be longer. Actually, that's double. I doubled it. So it's 1,200 feet, somewhere around there. But I was still marking. It's just a quick thing. But I would just finish with this, if I may. What I think that Mr. Gaynor is asking is that there be a windfall for under the plan, a windfall given the, I guess, circumstances under this case where the district court and the bankruptcy court have allowed 365 to take in not just the lease interest but also my client's beloved easement rights, which we say is a material part of the overall agreement. And if that would, I think we just heard the value of that windfall, or you flip it around, the forfeiture of our client's improvement of those facilities with pipelines and wells, which this is a deep well. You probably had cases. They are very expensive. That would work a windfall to Neville. And that should not be the purpose of a plan in reorganization. And to go back to Mr. Malloy's comment, all I can say is that this bankruptcy was very, the agri-processor's bankruptcy sale was done very quickly and mistakes were made. But I'm not going to pick on the lawyers who did it because they were under a tremendous amount of pressure. Okay. Thank you very much. We appreciate your arguments. We'll be back to you in due course. Thank you. We'll be in recess until tomorrow morning, 9 a.m.